Due to technical difficulties, there are unrecorded portions of this oral argument. How it's counsel. Thank you, Your Honor. May it please the court. I'm Rick Kraut thermal. I represent Keith Barnett. This is a criminal case out of the Western District of North Carolina. It's a drug case. The loan issue in the case is whether the district court properly enhanced Mr Barnett's total offense level for maintaining a premises for the purpose of distributing or manufacturing controlled substances. The facts of the case are relatively straightforward. The police learned that drugs were being distributed or sold out of and around a residence on Calvary Drive in Gastonia, North Carolina, which is near Charlotte. They recruited a confidential informant familiar with the residence. He knew the gentleman who lived there, who was a He had also met another gentleman in the driveway of the residence, and that was Mr Barnett, my client. Mr Barnett gave him his card one day and said, call him if he needed drugs. And so the police had this confidential informant set up a drug deal with Mr Barnett at the residence. The confidential informant went there and conducted the deal. He testified at the confidential informant doesn't say they were inside the house or outside the house. He didn't. He doesn't say he saw Mr Barnett come out of the house. Mr Barnett testified later in the trial and said, Yeah, that's me in those photos, but that I'm just sitting there at the picnic table. I don't actually give the guy any drugs. So from that, you could infer that it was probably at a picnic table outside the house somewhere. Anyway, based on the control by purchase, which was audio and videotaped, the police got a search warrant for the house, and they executed that warrant on October 9th, 2017. They drove up to the house in a raid style fashion, and Mr Barnett was standing out front of the house. He immediately ran inside the house, and then a few seconds later, he ran out a side door of the house and attempted to hop over the door. There's a heroin in it. Um, they arrested him, and he ultimately decided to go to trial. Two other witnesses testified at the trial and said that they lived in the neighborhood or were familiar with the neighborhood. One of them said that he bought drugs from Mr Rhodes. They both said that they they had never bought drugs from Mr Barnett, but they would see him outside the house, engaging in transactions. Both of them, um, said that he did not. Mr Barnett did not live there, but he would always be there. One of them said that on one occasion he drove up to the house, stayed in his car. He gave Mr Barnett some drugs. Mr Barnett took the drugs inside the house and then came back outside the house with the money and gave the the the gentleman the money and the gentleman drove away. And so that was can I ask a couple of quick questions to make sure I understand because it's a lot of record and y'all know it a lot better than than we do. Um, there were, in addition to the drugs over the fence, there were drugs found in the house. Correct. Right. And for sentencing purposes, your client, those drugs were attributed to your client as part of the conspiracy. Correct. For just it's sentencing, right? And just so I understand, that's because maybe it's not expressly set out, but it's because they were, you know, foreseeable to him and within the scope of the conspiracy, right? The same language. Correct. Right. So the question I've got is, um, why does it that same standard? We can call it Pinkerton. We can call it relevant conduct. If his co defendant, Mr Rhodes, imagine hypothetically it was only his house. He is the only one that but your client knew all about it and was a co conspirator with him, right? Then the maintenance of a drug house would be, you know, foreseeable to your client, right? And within the scope of the conspiracy, right? Because they got a drug conspiracy. And so I guess what I'm wondering, um, is why it matters. Like, I think it's easy to say that Mr Rhodes maintained a drug house. I don't think you would dispute that aspect, or at least I do not dispute that. And so why? Why wouldn't we simply say under under Pinkerton type analysis at sentencing that because his maintenance was was foreseeable to Mr Barnett and within the scope of the conspiracy, the drug conspiracy that he gets the two point enhancement for the same reasons he gets the attribution of the drugs that were found in the house. So what you're talking about is to the premises enhancement. Um, and that has it's rare, but it has been looked at a few times in the case law. There is a is it a, um, Eighth Circuit case. It's, uh, United States v Miller, which, um, sites United States versus Patton, I believe. And basically, the Eighth Circuit, um, the holding is is that, um, the Eighth Circuit assumed that Section two d 1.1 B 12, which is the premises enhancement, um, guideline, um, requires proof that the specific defendant being sentenced maintained the premises for the purpose of drug manufacturer distribution. The court explained that it is not sufficient that others possess the requisite purpose. And so United States v Payton 6 36 F 3rd 10 27 8th Circuit 2011 is the case where that emanated from. On the other hand, there is the United States versus Holmes and 11th Circuit case, which held that nothing in two d 1.1 B 12 prohibits a sentencing court from imposing the activity. Um, because unlike other sections of the guidelines were jointly undertake undertaken, criminal activity cannot be considered during sentencing. Two d 1.1 B 12 lacks an application note limiting its effect or limiting the effect of Section 1 B 1.3 A 1 B, which is talks about, um, conspiracy liability. And so those air kind of the two competing cases. There are some, uh, so basically, it's a split. And, um, there's a case out of Indiana, Northern District of Indiana. Site is United States versus Lewis 2020 U. S. District Lexus 41691 that discusses these two cases with a similar case. That judge was entertaining, and that particular judge sided with the 11th 1 B 12 in terms of applying conspiracy theory to that, um, to that particular enhancement. There's another case out of Northern District of Indiana, where a different judge found the opposite and says, I'm not I can find no appellate cases out of our jurisdiction that say you can apply conspiracy theory to that enhancement, and I'm not gonna do it. I'm gonna stick with the plain meaning of the language in the enhancement, and he did not apply it. So those are the kind of the two competing theories as far as the conspiracy theory being applied to that particular enhancement. And I'm urging the court to obviously to take the Eighth Circuit approach and not apply it, not apply conspiracy theory to the enhancement in terms of the facts. Well, in terms of the, um, the guideline itself, you know, it simply reads that if the defendant maintain a premises for the purposes of manufacturing or distributing a controlled substance increases total offense level by two levels, application notes 17 of that guideline talks about the application of the guideline. It says it applies to a defendant who knowingly maintains a premises for the purpose of manufacturing or distributing controlled substances, including storage of controlled substances for distribution. And then it says among the factors the court should consider a whether the defendant held a possessory interest in the premises, I e owned or rented it and be the extent to which the defendant controlled access to our activities at the premises. And so the case law in the Fourth Circuit has developed such that the Fourth Circuit considers that a fact specific inquiry that considers the are similar in United States versus Clark 665 Federal Appendix 2 98 2016. The apartment was owned by others. Clark lived out of state. She did not have a key to the apartment. However, the court still found that she controlled the premises because she had access. She stayed at the apartment at times. She had access to the interior of the apartment, and importantly, she participated in the rampant drug activity within the apartment, and thus she controlled the premises or maintained them for drug related purposes. Likewise, in United States versus Christian 5 44 Federal Appendix 1 8 2,000. Yes, ma'am. So why isn't that pretty similar to what we have here? I know none of these cases are gonna be exactly the same on the facts. We don't. Clearly, we don't have owning or renting the premises. But if the district's a very, as you said, a very fact intense inquiry, and there was evidence that if the district court believed it that there were, there's a large quantity of drugs found in the house. Um, your client, at least at least once, um, you know, was engaged in it. If you believe certain testimony engaged in a drug transaction that involved portioning out some drugs from the drugs at the house to sell to someone, and there was lots of up and down Calvary Street and that if someone couldn't get in touch with roads for their drugs from the house, they would get in touch with him. So there's drugs stored at the house with his knowledge and his use of them for controlling activities. The activity being selling drugs, um, in and around the house. Why, if a district court believed he's inside the house other than the day he was arrested when he ran in the house and quickly ran back out and my take on that, he said. I mean, you said so he's in the house on that day. Of course, he testified he was at a picnic video. But, of course, it was on video, and other people testified that he was at the side of the house at the door. And then there's someone who said that he was basically kind of road second in command, which would certainly suggest that he had access to the premises to control, you know, access to the drugs. So again, that's testimony both ways. But if the district court couldn't find by preponderance of the evidence that there's enough here. Well, to be fair to you, your honor, the guideline does say, um, you look at the extent to which he controlled activities at the premises and not necessarily in the premises. But the case law has come down such that they looked at defendants, although they didn't own the residence or have a key to the residence, they were inside the residence and controlling what was going on inside the residence. Um, and so my argument is, is that there's very little evidence of Barnett inside the house. All that what he's doing is outside the house, and I look at it not so much is how the government characterized it, which was that he was a partner in crime with Rodney Rhoades. I look at it is more like an employer employee relationship as if he were Rhoades's employee doing Rhoades's bidding. It's Rhoades house, and it was Rhoades purpose to maintain the residence for manufacturer drug distribution, not necessarily Barnett's purpose. So if I do, uh, as Judd Richardson suggested, do so under maybe a conspiracy theory liability and say, Well, we're gonna take the Eighth Circuit's approach and say, you know, he was a conspirator to Rhoades. Rhoades maintained the premises for manufacturer drug distribution. Therefore, the enhancement applies to Barnett also. But in terms of whether or not there was proof that Barnett's purpose was to maintain that residence for drug distribution or manufacturer, I argue that the evidence is insufficient. And you know, there's evidence he's there. He's engaging in drug activities, but not necessarily that he's relying on the premises for the purpose of engaging in his drug activities. So that's my response to that question. What do you do about him running stored? I'm sorry. Which question? Sorry. Sorry. I just asked as a follow up. You said there's no evidence he was relying on the premises. And I just asked, Where were the drugs stored that well, he sold? Well, he that's my argument is that they were on his person. So he ran in the house, and then he ran back out, and they tried to jump a fence. And then on the other side of the fence, they found some drugs in a bag. My argument is that's what that's his drugs that are in the bag, not necessarily the drugs that are inside the house that belonged to Rodney Rhodes. What about the drugs he sold? You know, other than on the one best one day, the other testimony about drug transactions. There's no evidence on where he got those drugs. There's no evidence that he went inside the house, got the drugs, brought him back out and sold him. He may have brought them there on his person. It's an insufficiency of evidence argument, and it's so why isn't the fact that he turned and ran back into the house? Probably the worst fact in this case for for this for this argument that he's just basically an for somebody who runs this house. But then the police show up, and his first instinct is to turn and run into the house. Why isn't that bad? And what do you say about that fact? Because the house is at the end of the street, and there's nowhere else to go. So he's trying to get away from the police. His instinct is to run into the house to get away from him. He's in there a few seconds, realizes that's a bad idea, runs back out of the house and tries to jump a fence and is unsuccessful, and he's caught. So that's my answer to that. So that's my time on opening. I'll yield to the government. Thank you. Thank you, Council Council. May it please the court. Anthony Enright for the United States. I'd like to begin by answering Judge Richardson's question, which is that this he can appropriately be held responsible. Good to style conspiratorial liability. There you have the acts. You have a jointly undertaken activity, and it's reasonably foreseeable conduct in furtherance of that activity, because he certainly knew about the house, and it was reasonably foreseeable. Also because Barnett aided and abetted Rhodes's maintenance of the stash house. Even if this court were to assume that the evidence doesn't establish Barnett's direct maintenance of that stash house. And do you agree with the front? I mean, do you agree with your friend on the other side that the Eighth Circuit has held the exact opposite of that? I do not agree with that, because the Eighth Circuit has explicitly said that that's an assumption, and other courts have treated that as an assumption, too, including the Sixth Circuit, which I think is the most recent court to weigh in on this subject, that in United States versus Rich, 14 fed forth 489, that's a published opinion. It treated the Eighth Circuit's decision as an assumption that we wouldn't be creating a circuit split, and it came out consistently with what I just said, which is there's no reason 1B1.3 wouldn't apply to the stash house enhancement. There's a little bit of a debate, I suppose, because the language of the guideline itself starts with, add two points, if the defendant. That's language that the guidelines use all over the place. Sometimes they use that language, sometimes they use the passive voice, and that's a factor to consider, but the guidelines themselves make pretty clear that that language isn't designed as an exception to relevant conduct principles. For example, in 3C1.3, which is the reckless endangerment during flight, starts the same way, if the defendant creates an unreasonable risk. But the comment says, well, it also applies if he aided and abetted somebody else who created that unres... Counsel, could you identify to me where in your brief you argued that he could be held liable for the actions of his co-conspirator under a Pinkerton theory? Your red brief to me is all about what he did and what the evidence showed about him. I didn't see any development of this argument about these cases of the Eighth and the Sixth Circuit and whether he could be held... Where's that in your red brief? You're 100% right, Your Honor. It's not in my brief. I was trying to answer Judge Richardson's question, but I don't claim that I asserted it in my brief. My omission, however, does not deprive this court of its authority to exercise its discretion to affirm on any ground fairly supported by the record. I do apologize for not noting it. So I have another question about whether I think this... I know there are a bunch of cases of this court saying this is highly fact-bound. There are cases saying it seems like clear error of view, but I guess I'm going to put... What strikes me as this case fundamentally comes down to on the facts that I understand them is... Question. Is actively participating in a drug trafficking conspiracy... Then a factual question. That strikes me as a question of what does the mean... What does the word maintain mean? But could you... Would you like to respond to that? Certainly, Your Honor. I mean, I think there's two parts to it, and one is the point we were just talking about. If this court accepts that relevant conduct principles apply, I think the answer is in almost all cases, yes. If you're participating in a conspiracy and the drug-involved premises are reasonably foreseeable, then you're going to be responsible for that. But separately from that... Assume I don't agree with that. So I'd like to hear part two. I figured that was where your question was headed. The answer... I think it's still a bit fact-specific. The word maintain... I don't know if this court needs to go as far as to say maintain includes all drug conspiracies involving a stash house. But what I think that even the plain language of the term does include is keeping a premises up, keeping its operation productivity. That's Black's Law Dictionary's language. Keeping a place's operation productivity going. It's not just maintaining it in the sense of keeping its physical integrity together or getting good repair. But the operation productivity is part of it. And what this court has said in Carbajal and Holloman and a couple of the decisions that the defense has cited is storing drugs at a premises for the purposes of distribution is a kind of maintenance. And I want to maybe help clear something up. The drugs that were found in the over the mantle, but the drugs he was charged with after the seizure and in the house. So he was storing drugs in the house. And it wasn't just an isolated incident. This is something that went on for at months. Several witnesses testified he's dealing drugs on Calvary Street routinely, all the time. He's at that house with Rodney Rhodes all the time. Can you respond to your to your colleagues suggestion that we ought to view? Maybe that's I don't unfairly characterize it, but he seems to suggest that it's about what's inside the house, that the premises doesn't include the curtilage, for example, right? And so, um, and that comes up in some apartment cases because there is no outside. But in a location like this, where there's a both an interior and exterior that is part of that location. Can you talk for just a second about whether we ought to limit the analysis to what happens inside the four exterior walls or whether the premises includes, you know, the picnic table that's right outside or have we want to describe? I think it includes both. And the reason is that the guideline itself talks about it's also highly relevant. The conduct that he conducted in and around the house, at least in so far as the court can make a reasonable connection. He invited, for example, the informant that this was a transaction arranged by Barnett, according to the informant himself. He said, Hey, holler at me. Come back. I got some good drop, and he invited him back to that look. He went back to that location at the premises. And I think he's I think defense is correct. I think the transaction occurred outside immediately adjacent to the premises. But that is an example of the defendant controlling access to or activities at the premises, which is what the commentary asked the court to focus on. And again, not isolated. He's he's conducting this drug business on the premises were at the end of this was in the words of the district court, their headquarters. They're using it as their headquarters. The district court inferred from all of this evidence that they were storing drugs there on a regular basis and coming out and dealing drugs on the street. It wasn't just that they happened to come into the same area, but they were using that house as their headquarters. And that is not a council. How much can I ask you? How much does your argument in this case depend on the fact that Barnett and Rhodes are cousins? Because I'm trying to hypothesize these exact same set of facts where the general the individuals are not related to each other at all. And I have an intuition that it might make a difference. But I like you to articulate that, right? Because it seems very clear this was Rhodes's house. I mean, there's there's paper with his name on it, right? And you obviously mentioned several times in the brief there. Can you talk about how much whether and to what extent it matters that these individuals are in isolation? That's perhaps one, you know, one of the ways we know that they were working together. But we also have eyewitness testimony that these two were working closely together that, for example, um, assume to go back to something your colleague was saying. I don't think there's really much doubt that they were working together, but there's, you know, the district court. I agree. The district court said it was their headquarters, which implies to me that there's something akin to partners. But another way to describe it is they're an employer and an employee, and maybe the answer is different, right? I think you could make sense to say that if there are two partners working out of the same place, they're both maintaining that place. If there's a if there's a master and a servant, though, I'm not sure we would say the servant is maintaining the place that the person works. So could you talk a little bit about that? Yeah, I suppose I disagree with that premise. I don't I do not think that this guideline is designed to draw a hierarchy. There are there's another another specific offense characteristic and guidelines for that, which is a managerial role versus a minor role. But in this case, and to give a couple examples, Clark is was one I can think of. And there's a couple other examples where this enhancement was applied to someone who was undisputedly a subordinate in a larger operation. Clark was, I think, the subordinate of a fellow named Freeman. Um, and I do think you can analogize it to a to an employer-employee relationship. I don't I'm a little reluctant to sort of embrace the formality here because it is a totality of the circumstances kind of thing. But certainly you could say that, for example, the manager of a pizza company, a pizzeria, is maintaining the pizzeria even if he's not the one with the ownership in the pizzeria or there's a higher boss. So I totally get that. Let me let me give you another example then that maybe helps illustrate what I'm a not getting it. No, no, no. I think I think this is genuinely hard. I mean, they're so now imagine that instead of Barnett, imagine there are 10 other people selling drugs out of this house. It's Rhodes's house, and there are 11 people who sell drugs out of this house, and they do all the things that Mr Barnett did. Is the government's view that every one of those 11 people is maintaining the house? I think that's a possibility, Your Honor. If you're talking about a store in drugs in that house and on a regular basis calling people to come to that house to conduct their drug business. Well, then it just strikes me that the government is interpreting maintaining as work out of that work that maintaining is just a synonym for working out of because I don't think it's plausible unless unless unless maintaining means working out of it strikes me as hard to say that those 11 individuals are all maintaining the house. I think the key difference between I mean working out of would be significantly harder than this case because what under what Mr Barnett did was store his drugs store his drug distribution materials his scales his bags in the house and in addition to that conducted his drug transactions in around the house and did so for a sustained period of time that strikes me as it strikes me as a much harder case to say well any kind of working out of the house if they bring their own drugs in their pocket but maybe they go into the house to use the restroom or get some water or something but they're working the streets harder harder case for us I think if you did have some kind of big house where each person's got their own setup selling drugs in in a room I think that's a much fairer case to make because every one of those people is responsible for converting this piece of property into into a drug involved premises this is something Congress was particularly concerned with this this guideline was a response to a particular congressional directive in the Fair Sentencing Act of 2010 and Congress said we want to make sure that you get an enhancement for maintaining the kind of premises described in 21 USC 856 which is a drug involved premise and that's a that's a long-standing statute that was focused on the the damage to property and the damage to the neighborhood by making a house into a drug premises and when you have if everyone were doing that I think they would all be equally responsible at least as responsible as the person who perhaps wasn't doing that but had a key to the place and just let them do it so I suppose that's my answer I I don't think the court needs to go as far as saying any any any drug house someone's working out of but I think this case makes it a little bit easier it is one he ran into in response to the police it is one he was working out of regularly he was a very close a close associate and someone who is working with the person who it's conceded was maintaining the house and he stored his drugs and I think this court can affirm the decision of the district court and ought to both because of mr. Barnett's conduct directly and through the principles of relevant if this panel has no further questions I will yield the balance my time back to the court you got some time on reply counsel thank you I want to saying that the guideline and the application notes say manufacture or distribution or storage for subsequent distribution there's no evidence that Keith Barnett sold or distributed drugs that had previously been inside that house there's no evidence that he manufactured drugs inside that house there is some evidence and that was this district attorney's testimony from state who had prosecuted mr. Barnett in state court he came into the federal case and said hey I was there the day he made his first appearance in state court and he told the drug the judge he takes responsibility for the drugs they're not mr. Rhodes's drugs however it's unclear what drugs he's talking about and the defense counsel asked him he said how do you remember this and the district attorney said I remember because he was charged with trafficking in cocaine but Keith Barnett was not charged with trafficking in cocaine the record lists what he was charged with that day it's on it's in volume two of the supplemental joint appendix page 466 there's a paragraph 67 there lists the eight charges that he had that day from state court none of them are trafficking in cocaine there are three trafficking in heroin charges to get trafficking in North Carolina you got to have at least four grams of heroin to get trafficking in cocaine in North Carolina you got to have 28 grams of cocaine the drugs that were found in that yard were half a gram of cocaine and eight grams of heroin so was Keith Barnett talking about the drugs found in the yard or was he talking about the drugs found in the house when he says I take responsibility for the drugs they're not Rodney Rhodes's drugs it's unclear from the we get to do that I mean the district court found that it applied and it seems like to me in that content I mean you know all right even if you have a way to question the credibility of some evidence we typically take the light evidence in the light most favorable to the district courts ruling in this context right we don't we don't go back yet there's a doubt it's a deferential standard and it has to be clear error but again my arguments an insufficient evidence argument there's not a lot of evidence that puts Keith Barnett's activities inside that house and so the guidelines is manufactured distribute or store for distribution for all we know Keith Barnett brought his own drugs to the house Rodney Rhodes let him sell drugs outside the house and that was Keith Barnett's role with respect to that and so if you're gonna say well the premises enhancement applies to Barnett you're gonna have to base it on the language in the application note that says at the premises and not necessarily inside the premises because the evidence was that Barnett was this employee type guy who was allowed to sell drugs outside the house not that he was an integral part of what went on inside the house and that's the bottom line so I ask you to rule in favor of mr. Barnett and strike the enhancement and return it to the district court for resentencing thank you well we certainly appreciate your argument and note that you're quite appointed and certainly appreciate you continuing to take that and doing your characteristically excellent job of representing your client we would love to come down and greet you as always unfortunately we can't do that but we look forward to doing it in the future and thank you for your service with that we'll ask court to close the in court of the day thank you your honor thank you your honors this honorable court stands adjourned until tomorrow morning God save the United States and it's due to technical difficulties there are unrecorded portions of this oral argument
judges: Julius N. Richardson, Allison J. Rushing, Toby J. Heytens